UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CR. NO. 3:23-CR-149 |
| v. | : | |
| | : | |
| NICHOLAS DOMBEK, | : | |
| DAMIEN BOLAND, | : | (Judge Mannion) |
| ALFRED ATSUS and | : | |
| JOSEPH ATSUS, | : | |
| | : | |
| Defendants. | : | (electronically filed) |

## GOVERNMENT'S BRIEF IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COUNT 1 OF THE INDICTMENT FOR FAILURE TO STATE AN OFFENSE

Respectfully submitted by:

GERARD M. KARAM
United States Attorney

*James M. Buchanan*
JAMES M. BUCHANAN
Assistant United States Attorney

# <u>TABLE OF CONTENTS</u>

Table of Authorities ................................................................................... ii

Introduction ............................................................................................ 1

Procedural Background ........................................................................... 2

Factual Background ................................................................................ 6

    I.  The Indictment ............................................................................ 10

Argument ............................................................................................. 40

  I.    Legal Standard .................................................................. 40
  II.   The Indictment Sufficiently Alleges a Single Conspiracy ........... 42
  III.  The Conspiracy Charged in the Indictment Occurred with the
         Statute of Limitations ........................................................ 49

Conclusion ........................................................................................... 52

## TABLE OF AUTHORITIES

### CASES

*Fiswick v. United States*, 329 U.S. 211, 216 (1946); ............................. 49

*United States v. Boyd,* 595 F.2d 120 (3d Cir. 1978), ....................... 43, 44

*United States v. Besmajian*, 910 F.2d 1153 (3d Cir. 1990) ................... 42

*United States v. Davis,* 306 F.3d 398 (6th Cir. 2002) ............................ 41

*United States v. Gordon*, 335 Fed. Appx. 236 (3d Cir. 2009)...............49

*United States v. Grunewald*, 353 U.S. 391(1957)………..……………….52

*United States v. Huet,* 665 F.3d 588 (3d Cir. 2012) ................. 41, 42, 44

*United States v. Jake,* 281 F.3d 123, 129 (3d Cir. 2002).  ............... 49, 50

*United States v. Kelly,* 892 F.2d 255 (3d Cir. 1989)..............................44

*United States v. Kissel,* 218 U.S. 601 (1910)…………………………….48

*United States v. Knox,* 347 F.2d 33 (3d Cir. 1965) ...……………………46

*United States v. Lee,* 359 F.3d 194 (3d Cir. 2004)  ...............................44

*United States v. Lester*, 282 F.2d 750 (3d Cir. 1960)............................44

*United States v. Maloney*, 71 F.3d 645 (7th Cir. 1995)................... 50, 52

*United States v. Mann,* 161 F.3d 840 (5th Cir. 2004). ...........................52

*United States v. Maker,* 751 F.2d, 614 (3d Cir. 1984)...........................45

*United States v. Rankin*, 870 F.2d 109(3d Cir. 1989) ...........................41

*United States v. Schurr*, 665 F.2d 549 (3d Cir. 1985) ...........................45

*United States v. Smith*, 789 F.2d 196 (3d Cir. 1986) ...........................44

*United States v. Vitillo*, 490 F.3d 314 (3d Cir. 2007)  ...........................41

*United States v. U.S. Gypsum, Co.*, 600 F.2d 414 (3d Cir. 1979) ..... 48,50

*United States v. Willis*, 844 F.3d 155 (3d Cir. 2016) ............................. 41

## STATUTES

Title 18, United States Code, Section 2 .................................................. 2

Title 18, United States Code, Section 668 ................. 2, 3, 6, 7, 19, 46, 61

Title 18, United States Code, Section 2314 ....................................... 2, 46

Title 18, United States Code, Section 3282 ........................................... 49

Title 18, United States Code, Section 3294 ........................................... 49

## OTHER AUTHORITIES

Federal Rule of Criminal Procedure 7 ................................................... 40

Federal Rule of Criminal Procedure 12 ...................................... 1, 42, 44

Third Circuit Criminal Jury Instruction §6.18.371A ............................ 43

Third Circuit Criminal Jury Instruction §6.18.371D ............................ 43

## INTRODUCTION

The defendants, Nicholas Dombek, Damien Boland, Alfred Atsus, and Joseph Atsus, stand accused of conspiring over a period of approximately twenty years to steal objects of cultural heritage from museums and other institutions, conceal or dispose of those objects, and to transport those objects across state lines.

Pending before the Court is a pretrial motion to dismiss Count 1 of the Indictment as to Defendants Boland, Alfred Atsus, and Joseph Atsus (hereinafter "Defendants"), alleging a failure to state an offense in the 47-page count for Conspiracy to Commit Theft of Major Artwork, Concealment and Disposal of Major Artwork, and Interstate Transportation of Stolen Property, pursuant to Federal Rule of Criminal Procedure 12(b)(3)(B)(v). (Doc. 100). For the reasons stated in this response, the Defendants' motion lacks merit and should be denied.

Count 1 of the Indictment more than sufficiently alleges federal offenses, places the Defendants on notice of the charges they must defend, and particularly describes the nature, timing, scope, and circumstances of the Defendants criminal acts.  Furthermore, the charged conspiracy adequately alleges the Defendants were members of

1

a single conspiracy and that the conspiracy was properly charged within the five-year statute of limitations for 18 U.S.C. §371.

## PROCEDURAL BACKGROUND

On June 6, 2023, a federal grand jury sitting in Scranton, Pennsylvania returned an Indictment charging the defendants with one count of Conspiracy to Commit Theft of Major Artwork, Concealment and Disposal of Major Artwork, and Interstate Transportation of Stolen Property, in violation of 18 U.S.C. §371. Defendant Nicholas Dombek was further charged with eight counts of Concealment or Disposal of Major Artwork, in violation of 18 U.S.C. §668 and §2, one count of Theft of Major Artwork, in violation of 18 U.S.C. §668 and §2, and one count of Interstate Transportation of Stolen Property, in violation of 18 U.S.C. §2314 and §2. Defendant Damien Boland was further charged with eight counts of Concealment or Disposal of Major Artwork, in violation of 18 U.S.C. §668 and §2, and two counts of Theft of Major Artwork, in violation of 18 U.S.C. §668 and §2. Defendant Joseph Atsus was further charged with four counts of Concealment or Disposal of Major Artwork, in violation of 18 U.S.C. §668 and §2, and one count of Theft of Major Artwork, in violation of 18 U.S.C. §668 and §2. Defendant Alfred Atsus

was further charged with three counts of Concealment or Disposal of Major Artwork, in violation of 18 U.S.C. §668 and §2, and one count of Theft of Major Artwork, in violation of 18 U.S.C. §668 and §2. (Doc. 1).

On July 13, 2023, defendant Boland appeared before then U.S. Magistrate Judge Joseph F. Saporito, Jr., and pleaded not guilty to all charges. (Doc. 18). Boland was released pending trial under the supervision of the Pretrial Services Office, Middle District of Pennsylvania, Scranton Division. (Doc. 38).

On July 15, 2023, defendants Alfred and Joseph Atsus separately appeared before Judge Saporito, and each pleaded not guilty to all charges. (Doc. 28 & 33).  Both defendants were released pending trial under the supervision of the Pretrial Services Office, Middle District of Pennsylvania, Scranton Division. (Docs. 30 & 35).

On January 2, 2024, defendant Dombek appeared before then Chief U.S. Magistrate Judge Karoline Mehalchick and pleaded not guilty to all charges. (Doc. 58).  Dombek was ordered detained pending trial. (Doc. 60).

After multiple unopposed motions to extend jury selection, trial, and the pre-trial motions deadline, by Order dated March 15, 2024, the

Court directed that the pretrial motion deadline would run on July 12, 2024, and set jury selection and trial for September 23, 2024. (Doc. 77).

On July 12, 2024, defendants Damien Boland, Joseph Atsus, and Alfred Atsus filed seventeen requests, motions, motions *in limine* and accompanying briefs in support requesting various relief, namely: a joint request for intent to use any evidence discovered under Rule 16 (Doc. 91); a joint request for written disclosure admissible under Rule 609(a)(1) and/or (2) (Doc. 92); a joint request for pretrial disclosure of hearsay statements pursuant to F.R.E. 807 (Doc. 93); a joint request for disclosure of co-conspirator statements pursuant to F.R.E. 801(d)(2)(E) (Doc. 94); a joint request for notice of any evidence the government intends to introduce at trial pursuant to Rule 404(b)(2) (Doc. 95); a joint motion to sever the case from defendant Dombek (Docs. 96-97); a joint motion for consideration of the Court to authorize the distribution of a written juror questionnaire in advance of jury selection (Docs. 98-99); a joint motion to dismiss Count 1 of the Indictment for failure to state an offense (Docs. 100-101); a joint motion *in limine* to exclude the Government's expert testimony regarding the authenticity, value, and/or age of the alleged objects of cultural heritage (Docs. 101-102); a

joint motion *in limine* to exclude evidence of firearm recovered from

Damien Boland's Aunt (Docs. 104-105); and a motion in limine from

defendant Joseph Atsus to exclude statements protected under the

spousal immunity privilege. (Docs. 106-107).

On July 24, 2024, Attorney Ernest D. Preate, Jr., filed an

unopposed motion to withdraw from his representation of defendant

Dombek. (Doc. 108).

On July 26, 2024, the Government filed a Motion for Extension of

Time to Respond to defendants' Pretrial Motions, Requests, and

Motions *in Limine.* (Doc. 109).  In that Motion, the Government

requested sixty (60) days in which to respond to the outstanding

pretrial motions and other requests.  The defendants all concurred to a

thirty (30) day extension, not the sixty days requested by the

Government.

On July 31, 2024, this Court ordered a Hearing on the withdrawal

of Attorney Preate, for August 13, 2024. (Doc. 112).  This Court also

ordered a Status Conference to be held later the same day. (Doc. 113).

During that Conference the Court directed that the Government's

response to the above-described motions would be due no later than

September 26, 2024.

The United States respectfully files this brief in opposition to the defendants' Motion to Dismiss Count 1 of the Indictment for Failure to State an Offense. (Doc. 100).

## FACTUAL BACKGROUND[1]

Beginning on or about August of 1999 and continuing to on or about September of 2019, defendants Dombek, Boland, Alfred Atsus, and Joseph Atsus entered into a criminal conspiracy with each other and with other conspirators known to the Government, namely Thomas Trotta, Dawn Trotta, Frank Tassiello, Ralph Parry, and Daryl Rinker. The object of this conspiracy was to steal physical objects from the custody, care, and control of various institutions, including museums[2],

---

[1] The "Factual Background" is derived from reports, interviews from witnesses, responses from Grand Jury Subpoenas, review of victim records, documents, and other information.  However, defense counsels and the defendants are cautioned that trial preparation is ongoing and may reveal additional facts not contained herein.

[2] The Government uses the term museum throughout this brief as that term is defined in Title 18, U.S.C. §668, namely: an organized and permanent institution, the activities of which affect interstate and foreign commerce, that is (a) situated in the United States; (b) is established for an essentially educational and aesthetic purpose; (3) has a professional staff, and; (4) owns, utilizes, and cares for tangible items that are exhibited to the public on a regular schedule.

from around the country.  Many of the physical objects which were either stolen or targeted to be stolen during the conspiracy were "objects of cultural heritage," as that term is defined in Title 18 U.S.C. §668.[3]

During the twenty years of the existence of the conspiracy, the defendants and other conspirators would conduct research in order to locate collections which contained valuables pieces of artwork, antiques, sports memorabilia, and other items.  The conspirators, including the defendants, then made several "reconnaissance" trips to the museums and other institutions for the purpose of gaining knowledge of the security measures, access points, exit points, and the physical displays of the above-described objects.  The defendants and/or other conspirators recorded these trips on video camera in order to later review the videos together and plan the proposed robberies. Sometimes, the conspirators, after reviewing the reconnaissance videos, would decide against committing the burglary, either due to the limited

---

[3] An "object of cultural heritage," as defined in Title 18, U.S.C. §668, is an object that is either over 100 years old and worth in excess of $5,000 or that is less than 100 years old and worth at least $100,000.

value of the objects on display, or because the security measures observed created too much risk.

Once a theft was agreed upon and planned, members of the conspiracy, including the defendants, would meet at pre-arranged locations, travel to the museum or other target of the burglary, break in, smash or destroy the protective display cases, and steal and remove the objects on display.

After the stolen objects were taken, members of the conspiracy, including the defendants, would travel back to northeastern Pennsylvania, where they would itemize, distribute, and break-down the stolen objects between the members of the conspiracy. Three locations in particular were often utilized: the residence of defendant Dombek, the residence of conspirator Dawn Trotta, and a bar owned and operated by defendant Boland, all located within Lackawanna County, Pennsylvania.

At these locations, but primarily at the residence of defendant Dombek, the stolen items would be stripped of gemstones and other valuable attachments before defendant Dombek melted them down into easily transportable pieces of valuable metal. The defendants and other

8

conspirators would then transport these pieces across state lines, often to New York City, where they were sold for the value of the metals themselves.  Other items, including artwork and antiques, that could not be easily broken down were transported to the homes of the conspirators for safe keeping and concealment.  In particular, the artwork stolen from the Everhart Museum, including "Le Grande Passion" by Andy Warhol, and a piece entitled "Springs Winter," by Jackson Pollock, were concealed within a home owned by defendants Alfred and Joseph Atsus in Union, New Jersey.  Defendants Alfred and Joseph Atsus also concealed sports memorabilia stolen from Keystone College at the same residence.  The ongoing concealment of these items has continued to this day.

Several stolen antique firearms were later distributed to members of the conspiracy.  These firearms include a Colt Dragoon pistol stolen from the Space Farms Museum in Wantage, New Jersey, in June of 2006, which was concealed by defendant Boland within his aunt's home in Arizona until 2023 when it was recovered by federal investigators. Two other antique firearms stolen during the same burglary were in the possession of defendants Alfred and Joseph Atsus, who continue to

conceal them to this day.  Several stolen antique firearms were concealed by conspirator Daryl Rinker who turned them over to state investigators in September of 2019.  Those firearms include a shotgun stolen from Space Farms Zoo & Museum in 2018, and multiple antique firearms stolen from the Ringwood Manor in Ringwood, New Jersey in 2011.

## I.    *The Indictment*

As discussed above, on June 6, 2023, a grand jury returned a thirteen-count Indictment charging the defendants with Conspiracy to Commit Major Art Theft, Concealment and Disposal of Major Artwork, and the Interstate Transportation of Stolen Property.  The defendants were also charged with the underlying substantive counts respective to their conduct which are not the subject of the instant motion.

Count 1 of the Indictment describes, through the information contained in its 42 pages, 15 numbered paragraphs, and 158 listed Overt Acts, how the defendants and other members of the same conspiracy executed the above-described scheme.   The Overt Acts section of Count 1 further breaks down the relevant acts by theft.

Not all acts committed by members of the conspiracy are included in the Overt Acts section of Count 1, and several listed overt acts include repetitive or on-going activities.  For example, Overt Act No. 7, states, "Prior to November 18, 2006, Nicholas Dombek, Alfred Atsus, Damien Boland, and Conspirator No. 1, either collectively or individually, made multiple visits to the Everhart Museum located in Scranton, Pennsylvania to view objects of cultural heritage displayed therein and to observe the security measures protecting said objects." (Doc. 1., Pg. 10).

A brief summary of each of theft, concealment, and/or transportation is described below:

<u>Keystone College</u>

On the night of August 13, 1999, Keystone College, located in Factoryville, Pennsylvania, presented a play entitled, "An Evening with Christy Matthewson."  Matthewson, a Factoryville native, was an original Baseball Hall of Fame Inductee and one of the greatest pitchers in early twentieth century baseball.  Conspirator Thomas Trotta ("Trotta) attended the play with a colleague and observed display cases containing multiple Matthewson-related memorabilia therein.  Later

that night or in the early morning hours of August 14th, Trotta returned to the College with Joseph Atsus.  Trotta entered the building, broke the glass display case, and stole a Spalding baseball jersey worn by Matthewson, an original 1902 contract between Matthewson and the N.Y. Giants, and an original 1916 contract between Matthewson and the Cincinnati Reds.  The college estimated the total value of the stolen memorabilia was approximately $90,000.  During the theft Trotta and Joseph Atsus communicated using two-way radios ("Walkie-Talkies").

After Trotta and Joseph Atsus left Keystone College, they stored the stolen items in Atsus' grandmother's home before ultimately moving them to Alfred Atsus' residence and then a residence owned by the Atsus family in Union, New Jersey.

Everhart Museum

Prior to November 18, 2005, Trotta and the Defendants identified the Everhart Museum as a potential target for the conspiracy.  During one of their multiple reconnaissance visits, a museum guard mentioned to Trotta that another painting by Jackson Pollock had recently been appraised at over $1,000,000.  Dombek then used art reference books to look up the approximate worth of various items displayed at the

12

Everhart.  Ultimately, the conspirators agreed to steal "Springs Winter" by Jackson Pollock, and "Le Grande Passion" by Andy Warhol, both publicly displayed at the museum.

While Dombek advocated that the conspirators should commit a daytime burglary, on the night of November 18, 2005, Trotta, Joseph Atsus, and Damien Boland, used the cover of a fight at a local Scranton bar to break into the Everhart Museum.  After seeing the large number of Scranton Police Department officers responding to the fight, the conspirators agreed that it would be an ideal time to perpetrate the break-in and theft from the Everhart Museum.

Upon leaving the bar, Boland drove Joseph Atsus and Trotta to the Everhart Museum. Trotta then used a ladder which had been left by contractors working at the museum to break through the exterior and interior doors of the museum.  Trotta then entered the museum, removed the above-described paintings from the walls, and returned them to the truck driven by Boland and containing Joe Atsus.  After seeing the paintings, Joseph Atsus exclaimed, "we're rich."

After the burglary, the trio drove the paintings to Boland's residence before ultimately moving them to the Union, New Jersey home owned by the Atsus brothers.

Later, the Atsus brothers observed a newspaper article claiming that the owner of "Springs Winter," Arthur Phillips, had offered a cash reward for the return of the painting. Trotta, Boland, and both Atsus brothers used a public pay phone in Union, New Jersey, to speak to Phillips. During the call, Trotta read the name of a gallery posted on the back of the painting to prove its authenticity. Phillips reported the call to the Federal Bureau of Investigations ("FBI").

The next day, the conspirators saw the public pay phone utilized by them had been removed. Nervous about a potential investigation, Alfred Atsus paid Boland $5,000 to take over Boland's split of any future proceeds from the sale of the stolen paintings.

Space Farms Zoo & Museum #1

After the Everhart burglary, Trotta discovered the Space Farms Zoo & Museum, located in Wantage, New Jersey, had one of the largest collections of antique firearms in the country. Trotta, along with

Defendants Dombek, Boland, and Joseph Atsus, decided to research the museum with the goal of later stealing some of the valuable antiques.

Prior to June of 2006, Trotta, Boland, Dombek, and Joseph Atsus made several trips to the museum.  One at least one of these trips Trotta and Joseph Atsus recorded their visit. In their video recording, Joseph Atsus and Trotta talk about potential police response times if they conducted the burglary.  The two also zoom their camera in on potential targets of the burglary, namely a display case on the first floor of the museum which contained several antique pistols, including, but not limited to: a Colt Paterson pistol, a Colt Walker pistol, and a Colt Dragoon pistol.

On a night prior to June 27, 2006, Boland drove Trotta and Joseph Atsus to the Space Farms Zoo & Museum with the purpose that they would enter and steal several of the pre-selected antique firearms. However, a herd of buffalo which is located outside the museum's buildings in a fenced paddock, scared Trotta and the group left without breaking in.  On the night of June 27 into June 28, 2006, Boland again drove Trotta to the Museum.  This night Trotta entered the museum,

smashed through the front door, smashed the pre-selected display case, and stole the above-described firearms.

After the burglary, Trotta offered to sell the Colt Walker pistol to another co-conspirator, Daryl Rinker, for $6,000.  Rinker declined. Ultimately, the three pistols were split up between Boland and the two Atsus brothers.

In 2023, after the Indictment was made public, a relative of Boland reached out to the FBI and informed them that Boland had left an antique pistol at her house in Arizona.  FBI agents later recovered a Colt Dragoon pistol, which appears to be the same pistol stolen from the Space Farms Zoo & Museum.[4]  The current whereabouts of the other two stolen pistols are unknown.

---

[4] Parker Space, a New Jersey State Senator and the owner/operator of Space Farms, was unable to provide investigators with the exact serial number of the stolen Colt Dragoon because his grandfather, the original proprietor of the museum, did not document every item contained therein.  However, after physically inspecting the recovered pistol, Mr. Space was able to confirm that it appears to be same Colt Dragoon stolen from his museum in 2006.

Lackawanna County Historical Society

The conspirators later targeted the Lackawanna County Historical Society, in Scranton, Pennsylvania, due to its display of valuable antiques and its proximity to the defendants, who were all residents of northeastern Pennsylvania.

On the night of July 2, 2010, Boland drove Trotta to the Historical Society where Trotta broke through a window in the rear of the building, entered the museum, and stole a 1903/1904 Tiffany lamp appraised at approximately $10,000. Boland and Trotta later drove to New York City where they sold the lamp to a fence named "King Joe" from $6300. Boland and Trotta split the proceeds between themselves.

Ringwood Manor

Prior to March of 2011, Dombek and Trotta identified Ringwood Manor, a museum run by the New Jersey State Parks Department, located in Ringwood, New Jersey, as the next target of the conspiracy. This museum displays multiple valuable items, including antique firearms, paintings, and household items made of precious metals.

17

While researching the museum, the conspirators made several reconnaissance trips, including trips by Dombek, Trotta, Boland, and Al Atsus.  Ultimately, Trotta, Boland, and Joseph Atsus agreed to break into the museum on a night that Joseph Atsus' then-wife was away.

On March 2, 2011, Joseph Atsus drove Boland and Trotta to museum using his wife's Nissan Altima, and dropped them off on the grounds of the museum.  All three men had walkie-talkie radios to communicate. Boland and Trotta broke into the museum and Boland immediately disabled the alarm system. Boland had previous experience working as a technician for ADT security systems.

As Boland disabled the alarm, Trotta moved directly to a display containing antique firearms which the conspirators had earlier identified as the items to be stolen.  Trotta and Boland then removed:  a painting entitled "Upper Hudson," by Jasper Crospey, a 19th Century American painter best known for his Hudson River School landscapes; various silver and gold household items; various antique bayonets and firearms, including a W.F. Mills & Son 7-barrel percussion rifle, and an Aston Model cavalry pistol.  The total value of the stolen items was estimated by the museum to be worth over $500,000.

18

After stealing the above-described items, Boland and Trotta were picked up by Joseph Atsus and driven to Dawn Trotta's home, the sister of Thomas Trotta.  There, the conspirators inspected the items and discovered most of the silver household items were silver plated.  Trotta gave Dombek the majority of the stolen silver in exchange for $3,500. Trotta gave Joseph Atsus $500 for driving during the robbery. The paintings and firearms were eventually moved to Dombek's residence for safe keeping.  The antique firearms were sold to Dombek's neighbor and fellow conspirator Daryl Rinker.  In September of 2019, Rinker provided state investigators with the stolen W.F. Mills gun and the Aston Cavalry pistol.

<u>Scranton Country Club</u>

The conspirators next targeted the Art Wall, Jr. Room at the Scranton Country Club.  This country club, which is not a museum for purposes of 18 U.S.C. §668, displayed over a dozen large trophies belonging to the late Art Wall, Jr., a professional golfer from Pennsylvania best known for winning the 1959 Masters.

Trotta, Boland, and Joseph Atsus devised a plan in which Joseph Atsus would pose as a prospective member of the country club in order

to gain access to the trophy room.  After Atsus was given a tour by club personnel, he reported the layout of the clubhouse and a description of the trophies to his fellow conspirators.

On the night of March 10, 2011, Boland drove Trotta to the clubhouse where Trotta found an open window, cut through a screen, and entered the building.  Trotta grabbed eleven trophies belonging to Art Wall and ran to the awaiting car driven by Boland.  The conspirators received several trophies as their individual payments for the theft, but the majority of the trophies were melted down at Dombek's residence into small pieces.  Boland and Trotta then sold the pieces to pawnshops in New York City for a total of $6,000. Boland, Trotta, and Joseph Atsus spit the $6,000 evenly between them.

Sterling Hill Mining Museum

Prior to July of 2011, Dombek and Trotta planned the burglary of the Sterling Hill Mining Museum located in Ogdensburg, New Jersey. Dombek, a keen rock-enthusiast, believed there was a small fortune worth of gold ore and gold nuggets on display at the museum.  Trotta and Dombek took numerous trips to the museum in order to gain

knowledge about how the gold was displayed, security measures at the museum, and other information for the break-in.

One night, prior to July 27, 2011, Joseph Atsus drove Trotta to the museum in order for Trotta to break in and steal the gold ore and nuggets from therein.  However, as Trotta looked through a window, he observed that the objects they planned to steal had been moved into a closed safe.  Trotta and Atsus decided to steal the objects during the day when the museum was open.

On July 27, 2011, Joseph Atsus again drove Trotta to the museum where Trotta, wearing a painter's mask, entered the museum through a side door they had earlier discovered during their reconnaissance missions.  Trotta smashed the display glass with a small axe and stole approximately $400,000 worth of gold ore and nuggets from the museum.

Joseph Atsus drove Trotta back to Pennsylvania where Dombek utilized a torch to separate the gold from any rock in the ore.  Dombek and Trotta then took several trips to New York City where they sold the disgorged gold for approximately $120,000-$140,000.  Joseph Atsus

received $17,000 for his share and Dombek and Trotta split the remainder between themselves.

USGA Golf Museum & Library

With the successful theft from the Sterling Hill Mining Museum, the conspirators began to look for other museums or institutions where large amounts of gold or other precious metals were displayed. They decided to concentrate on sports museums, particularly museums displaying large trophies.  One such museum was the United States Golf Association ("USGA") Golf Museum & Library. The USGA is the governing body for golf in the United States and maintains a museum and library in Liberty Corner, New Jersey, dedicated to the history of the game.  The conspirators, during several reconnaissance trips to that museum, found several large, gold trophies which the museum kept on display therein.

During these trips, the conspirators also discovered that the USGA used safety or ballistic glass to protect the items displayed. Dombek tested the glass and advised Trotta that he would need to punch multiple holes in the glass before it could smashed.  Rinker gave

Trotta a piece of such glass to use as practice, and Boland gave Trotta a center-punch device in order to create such holes.

During the planning portion of this burglary, Dombek advised that the conspirators should lay a heavy cable across the entrance to the museum to slow any police response.  Dombek further advised that the conspirators chop down several trees near the entrance to achieve the same goal.  Prior to the burglary, Boland rented a car which he and Trotta would use to drive to the museum.

On the night of May 15-16, 2012, Boland drove Trotta the USGA museum and dropped him off near the entrance.  Trotta broke into the museum, smashed the pre-identified displays, and took the U.S. Amateur trophy and the 1953 Hickok Belt belonging to Ben Hogan which were on display.  During the incident, Trotta cut himself on the broken glass and bled over the crime scene.

Boland and Trotta melted down the trophy in Dawn Trotta's garage, while Trotta took the belt to Dombek's residence.   There, Dombek took off the precious gems from the belt, including diamonds, sapphires, and rubies.  Dombek then melted the metal from the belt

into small pieces.  Trotta eventually took the gems and metal to New

York City where he sold the items for a total of approximately $130,000.

### Harness Racing Museum and Hall of Fame

The conspirators then targeted the Harness Racing Museum and

Hall of Fame located in Goshen, New York. This museum displayed

several large harness racing trophies and was within a few hours' drive

of the conspirators home base in northeastern Pennsylvania.

Prior to December 18, 2012, Trotta, Dombek, and Boland planned

the theft from the Harness Racing Museum.  Boland bought a

collapsible ladder for Trotta to use during the break-in, while Dombek

provided Trotta an axe to smash the display glass.

On the night of December 18, 2012, Boland drove Trotta to the

museum and dropped him off near the entrance. Trotta entered the

second floor of the museum used an axe to smash a display case on the

first floor of the museum, containing several large gold trophies.  Trotta

removed fourteen of the trophies, worth a total of approximately

$329,000, exited the museum, and ran to the waiting vehicle driven by

Boland.  Boland and Trotta later took the trophies to Dawn Trotta's house where Boland took a portion of the trophies as his payments.

Trotta took the remainder of the stolen trophies to Dombek's residence where Dombek melted down the trophies into small metal discs or pieces.  Dombek also removed several "Faberge" coins which were attached to one of the stolen items.  To melt the trophies, Boland and Trotta rented a torch from a tool rental business using Alfred Atsus' account.  For allowing them to use his account, Alfred Atsus received $100 from Trotta.

Trotta, Boland, and Dombek eventually sold the resulting precious metals in New York City for a few thousand dollars.

<u>National Museum of Racing & Hall of Fame</u>

The conspirators continued to research sports museum which displayed large gold trophies.  Besides the Harness Racing Museum, Trotta and Boland also made reconnaissance trips to the Kentucky Horse Park in Lexington, Kentucky, the Kentucky Derby Museum in Louisville, Kentucky, and the National Steeplechase Museum in Camden, South Carolina.  During these trips, Trotta recorded Boland

and himself scouting museum access points, security measures, and the trophies which were the potential targets of the thefts. Ultimately, the Kentucky Horse Park and Churchill Downs were ruled out as potential targets because they were too far away from Pennsylvania and the security measures was extensive. The National Steeplechase Museum was ruled out because the items on display were silver, and the conspirators believed stealing silver, with a much lower value per ounce than gold, was not worth the risk.

The conspirators decided to next burglarize the National Museum of Racing & Hall of Fame located in Saratoga Springs, New York. During the planning phase of this burglary, Trotta, Boland, and Dombek made multiple reconnaissance trips to the museum. Prior to the theft, Trotta and Boland bought walkie-talkies and a telescoping ladder to use during the burglary.

On September 1, 2013, Boland drove Trotta to the museum where Trotta climbed a fence, broke into the museum and smashed several display cases with a center punch device. Trotta grabbed five trophies, including the 1905 Saratoga Special Trophy, the 1903 Brighton Cup Trophy, and the 1903 Belmont Stakes Trophy. Trotta then took the

26

trophies back to Boland's car and the pair eventually drove to a restaurant in northeastern Pennsylvania where they met in the parking lot and itemized the results of the burglary. Boland and Trotta then melted down the trophies and sold the precious metals for over $100,000 to an individual in New York City.

<u>Yogi Berra Museum & Learning Center</u>

In 2014, members of the conspiracy, namely Trotta, Dombek, and Joseph Atsus decided that the next target would be the Yogi Berra Museum & Learning Center located in Little Falls, New Jersey. Again, the conspirators made several reconnaissance trips to the museum to orient themselves to the interior layout of the museum, observe access points, observe security measures, and decide what objects of cultural heritage they would steal.

On October 8, 2014, Joseph Atsus drove Trotta to Little Falls, New Jersey, where Trotta accessed the museum through a baseball stadium connected to the rear of the building. Trotta broke the glass displays and stole 9 of the 10 World Series rings that were part of a single display depicting Yogi Berra as the most successful major league

baseball player of the twentieth century.[5]   Trotta also took several other championship rings and two MVP plaques which were also on display in the museum. One of the World Series rings was dropped by Trotta on the way out of the museum and was recovered the next day by police. Trotta left his break-in tools at the museum and also left traces of blood at the scene after cutting himself during the theft.  The DNA from this blood sample was later analzyed and compared to DNA samples left at the crime scenes of the USGA Golf Museum, the Franklin Mineral Museum discussed below, and other burglaries conducted by Trotta and/or other members of the conspiracy.  The DNA was found to match a DNA sample taken from Trotta after his arrest in this case.

---

[5] These rings were part of a set presented to Yogi Berra by Yankees owner George Steinbrenner in 1999 at Yogi Berra Day at Yankee Stadium.  They constitute a complete "reconstructed" set of rings World Series won by Berra during his time as a Yankee player.  Berra did not have a completed set of World Series rings for each championship team he was a member of. In the 1940's and 1950's, the practice of presenting World Series rings to all team members was not yet universal.  For instance, some years in which he was part of a World Series championship team, Berra opted to receive other commemorative prizes, such as watches.

After rejoining Joseph Atsus in the waiting car, Trotta and Atsus drove to Dawn Trotta's garage where Trotta showed Atsus the rings. Trotta later took the rings to Dombek's residence where he pried out the gems and melted the rings into small gold pieces. Trotta and Dombek later sold the gems and gold to a fence in New York City for approximately $10,000. Joseph Atsus, Trotta, and Dombek, split the proceeds between themselves.

<u>Hillwood Museum</u>

The next museum which the conspirators targeted was the Hillwood Estate, Museum & Gardens located in Washington, D.C. This decorative arts museum was the former home of Majorie Merriweather Post. Items displayed at the museum include Faberge eggs and other jewelry.

Prior August of 2015, Trotta, Boland, Dombek, and another conspirator, travelled to the museum to conduct reconnaissance. During at least one of these visits, Trotta and Dombek made a video recording of themselves casing the grounds of the museum.

On the night of August 25-26, 2015, the other conspirator drove Boland and Trotta to the museum.  Boland and Trotta then exited the car, ran through the extensive grounds to the main building, and smashed a ground floor window with a tool.  Trotta then entered the museum but was observed by a security guard. Trotta and Boland ran away to the waiting car driven by Parry.

<u>International Boxing Hall of Fame</u>

The next museum targeted by the conspirators was the International Boxing Hall of Fame located in Canastota, New York. This museum became a target of the conspiracy because it displayed multiple gold trophies and was within a few hours drive of the conspirators northeastern Pennsylvania base.

Prior to the break-in, Boland and Trotta made several reconnaissance trips to the museum.  On November 5, 2015, Boland drove Trotta to the museum where Trotta smashed a window with an axe, smashed several display cases and stole six championship belts, including four belonging to boxer Carmen Basilio, and two belonging to boxer Tony Zale.  The museum estimates that the belts are worth a combined total of $32,000.

After leaving the Hall of Fame, Boland and Trotta took the belts back to Dombek's residence where he removed the stones from the belts and melted down the metal parts into small gold pieces.  Trotta and Boland took the metal to New York City where they received approximately $400 in exchange. The stones/gems remained with Dombek.

### Roger Maris Museum

The conspirators next decided to steal the Hickok Belt belonging to Roger Maris.  They agreed upon this target after the theft from the USGA museum, where the conspirators had successfully stolen Ben Hogan's Hickok belt.  After researching where similar belts were displayed, the conspirators decided on the Roger Maris Museum located within the West Acres Mall in Fargo, North Dakota.

Prior to the theft, Boland and Trotta drove out to North Dakota on multiple occasions to "case" the mall and museum.  On their last trip, they drove a car rented by Dawn Trotta to Minnesota where they staged for the theft.  Boland drove Trotta to the mall while Trotta was wearing a firearm's outfit as a disguise.

On the night of July 26, 2016, Trotta, wearing the fireman's disguise, broke into the mall, smashed the display case at the Roger Maris Museum, and stole Maris' 1961 Hickok Belt and MVP trophy. Trotta then took both to the waiting car driven by Boland.  Boland and Trotta drove straight back to Boland's bar in Scranton, Pennsylvania, where they cut the belt in half and weighed it. Both parties took half of the belt as their share.  Trotta later took his half and the MVP trophy to Dombek's residence where he heled melt it down into small pieces. Boland and Trotta each sold their halves of the Hickok belt and Trotta also sold the gold and silver from the MVP Trophy in New York City. Dombek kept the stones from the Hickok Belt as his payment.

Franklin Mineral Museum

In 2017, Dombek and Trotta decided to burglarize the Franklin Mineral Museum in Franklin, New Jersey.  Again, they made several reconnaissance trips to the museum, posing as tourists.  During one of the trips, Dombek advised Trotta to upend a picnic table near the museum to use as a makeshift ladder.

On June 19, 201, Trotta was driven to the museum by another individual.  Trotta scaled the fence and upended a picnic table to enter

an upper window the museum. However, the picnic table was too short, and Trotta found a nearby ladder to gain entry to the museum.  Once inside, he cut himself on the broken glass before he smashed a display case and stole as many gems or stones as he could.

After leaving the scene, Trotta met with Dombek to look at the stones. They both then took the stones to New York City, but did not find a buyer.

Antique's Exchange

On February 21, 2018, Trotta drove past the Antique's exchange, a jewelry store located in Hawley, Pennsylvania.  Trotta decided this store may be worthwhile to burglarize, and returned to the store in the early morning hours.  Trotta broke the front door, smashed display cases and stole as many small jewelry items and coins as he could grab.

After leaving the scene, in which he cut himself and left DNA evidence, Trotta went to Dombek's residence where he sold some of the silver coins to Daryl Rinker.  Dombek melted the remainder of the items down and Trotta sold the resulting metal pieces in New York City.

Cade's Coins

In March of 2018, Daryl Rinker provided the name of a coin and jewelry store, Cade's Coins, located in Pittston, Pennsylvania, as a potential victim of the conspiracy. Rinker drew a map depicting the layout of the interior of the store on the floor of Dombek's garage and instructed Trotta where the valuable items were displayed.

On March 18, 2018, Trotta drove to the store, broke in, smashed several display cases and stole as much jewelry as he could quickly grab. Trotta later melted down the jewelry with Dombek at Dombek's residence, and sold the metal pieces in New York City. Rinker received several rings as his share of the proceeds. In September of 2019, Rinker turned over the stolen rings in his possession to state investigators.

<u>Bertoni Gallery</u>

In June of 2018, Trotta rented a car in his sister's name and drove to the Bertoni Gallery located in Chester, New York, for the purpose of breaking in and stealing jewelry. After entering the store, Trotta smashed several display cases and took nearly $19,000 in small jewelry items. Trotta then drove to Dombek's house where Dombek removed the small gemstones from the jewelry before melting them down into

small pieces of precious metals.  Dombek kept the stones while Trotta

sold the metal pieces in New York City for approximately $6,000.

Space Farms Zoo & Museum #2

In August of 2018, Trotta re-burglarized the Space Farms Zoo &

Museum.  On August 8, 2018, Frank Tassiello drove Trotta to the

museum in New Jersey.  Trotta, similarly to the 2006 burglary,

smashed the front entrance door before entering the museum and

taking a Colt Model revolving shotgun valued at approximately

$32,000.  Trotta later sold the shotgun to Rinker.  In September of 2019,

Rinker provided the shotgun to state investigators.

Basic Irish Luxury

On October 11, 2018, Tassiello and Trotta drove to Newport,

Rhode Island, where Trotta broke into Basic Irish Luxury, a jewelry

store, and stole numerous small jewelry items valued at approximately

$75,000 to $100,000.

Trotta then returned to Tassiello's vehicle and pair drove back to

Pennsylvania. Trotta later took some of the rings to Dombek's residence

where Dombek melted them down into small metal pieces for re-sale in New York City.

### Harvard Mineral & Geological Museum

Prior to April of 2019, Dombek, Trotta, and Boland agreed to target the Harvard Mineral & Geological Museum, located in Cambridge, Massachusetts, in order to steal precious gemstones on display therein. The conspirators made several reconnaissance trips, including at least two trips which Trotta videotaped. In both videos, the conspirators discuss the items which were the object of the theft. In one video, Dombek and Trotta discuss the best way to break into the museum.  Ultimately, the conspirators decide not to commit a nighttime robbery, but instead smash the display cases to steal a large diamond during the day.  Similarly to the Sterling Hill Museum and Roger Maris Museum, Trotta was going to disguise himself for the robbery.  The plan was for Trotta to dress as a Hasidic Jewish man, enter the museum as a tourist, smash the display case, steal the diamond, and exit the museum as quickly as possible.

Frank Tassiello agreed to be the driver for the theft and helped Trotta created the disguise.  Tassiello drove Trotta to the museum, but the diamond was no longer on display and the theft was called off.

Other Investigatory Steps

Federal and state investigators were able to identity Trotta as a potential suspect in this case due to the DNA links between several of the burglaries, and other information.  In April of 2019, Trotta was arrested for an unrelated DUI offense.  In his car were several pamphlets from sport museums and jewelry stores. Also recovered were ski masks, gloves, walkie-talkies, and a sledgehammer.  Trotta began to cooperate with state and federal officials against his other co-conspirators. During this time, Trotta expressed that he had last seen several of the stolen objects inside a safe at the Atsus' residence in Union, New Jersey.

During Trotta's cooperation phase, he made several consensual recordings of Dombek, Rinker, and Boland.  In those recordings, Dombek admitted to burning and burying several paintings and frames and declared that his co-conspirator, Rinker, was "weak" and that if the

police confront Rinker, "we are done."  Dombek also admitted to selling several stolen items to other individuals.

On May 9, 2019, Trotta drove to the above-described Union, New Jersey residence and broke into the home in an attempt to steal the Everhart paintings, Matthewson memorabilia, and other stolen items back from the Atsus brothers.   Responding police officers observed a large safe which had been attempted to be moved out of the home. Joseph Atsus relayed to investigators that Trotta was likely responsible for the attempted burglary.

In June of 2019, Trotta was re-arrested after committing another burglary in Pawling, New York.   On June 10, 2019, Trotta had a conversation with Boland, in which Boland complained that he was short on money and that Boland and Trotta should burglarize the National Racing Museum & Hall of Fame again.  This conversation took place during a period of time in which Trotta was acting as a confidential informant with the Pennsylvania State Police, but was also, without investigators' knowledge, continuing to commit thefts.

In September of 2019, search warrants were executed at Dombek and Rinker's homes in Pennsylvania by members of the Pennsylvania

State Police. During the execution of those warrants, troopers found lab materials in Dombek's garage consistent with his ability to melt down trophies and ores into small metal pieces. They also found a handmade "scepter" with inlaid gems which were consistent with some of the stolen gems described above.  Rinker's residence was found to contain several hundred firearms, and Rinker later turned over several of the stolen antique firearms described above, which he had kept concealed at an off-site location.

After Dombek's arrest on state charges, he was released after posting bail.  The day after his release, he went to the homes of Boland, Dawn Trotta, and Rinker, and threatened them.  Dombek later pled guilty to witness intimidation.

In June of 2023, after being notified by the FBI of the arrest warrant on this case, Dombek escaped into the nearby woods in northeastern Pennsylvania and remained at large until he surrendered on January 1, 2024.  He is currently incarcerated pending trial.

On April 18, 2024, Daryl Rinker passed away.

# ARGUMENT

The defendants premise their motion to dismiss on the grounds that Count 1 of the Indictment improperly joins several smaller conspiracies into one overarching conspiracy, and that the statute of limitations has run on these separate, smaller conspiracies. (Doc. 101 at 12). For the reasons stated below, the defendants' arguments fail because the Indictment sufficiently alleges one conspiracy, which includes continuing crimes agreed to be committed and committed by the defendants, such as concealment of major artwork, and the Indictment was filed within the five-year statute of limitations for conspiracy.

## I. *Legal Standard*

Federal Rule of Criminal Procedure 7 provides that an indictment "must be a plain, concise, and definite written statement of the essential facts constituting the offense charge." Fed. R. Crim. P. 7(c)(1). An indictment is sufficient as long as it "(1) contains the elements of the offense intended to be charged, (2) sufficiently apprises the defendant of what he must be prepared to meet, and (3) allows the defendant to show with accuracy to what extent he may plead a former acquittal or

conviction in the event of a subsequent prosecution." *United States v. Vitillo*, 490 F.3d 314, 320 (3d Cir. 2007) (internal quotation marks omitted). In other words, "no greater specificity than the statutory language is required so long as there is sufficient factual orientation to permit the defendant to prepare his defense and to invoke double jeopardy in the event of a subsequent prosecution." *United States v. Rankin*, 870 F.2d 109, 112 (3d Cir. 1989).

"Generally, an indictment will satisfy these requirements where it informs the defendant of the statute he is charged with violating, lists the elements of a violation under the statute, and specifies the time period during which the violations occurred." *United States v. Huet*, 665 F.3d 588, 595 (3d Cir. 2012). A court should uphold an indictment "unless it is so defective that it does not, by any reasonable construction, charge an offense." *United States v. Willis*, 844 F.3d 155, 161(3d Cir. 2016) (internal quotation marks omitted). Further, an indictment is to be construed liberally in favor of its sufficiency. *See e.g., United States v. Davis*, 306 F.3d 398, 411 (6th Cir. 2002). The scope of the court's review is limited to the four corners of the indictment and evidentiary questions such as credibility should not be considered at

41

this stage. *Huet*, 665 F.3d at 595-696.  In deciding a Rule 12 motion to dismiss, trial courts must accept as true the factual allegations set forth in the indictment. *United States v. Besmajian*, 910 F.2d 1153 (3d Cir. 1990).

In their motion to dismiss, the Defendants first argue that "inflammatory" allegations against Defendant Dombek, including that he destroyed evidence, threatened witnesses, and conspired to poison and kill Government witnesses, are grounds to dismiss Count 1 of the Indictment.  (Doc. 101 at 2, 7-8).  This argument, however, is based upon what the Defendants believe the facts and evidence in this case will show at trial, and not on what is alleged in the Indictment. It is therefore not relevant for the instant motion to dismiss for failure to state an offense.  *See Huet*, 665 F.3d at 595.

## II.   *The Indictment Sufficiently Alleges that the Defendants were Members of a Single Conspiracy*

To prove conspiracy to commit an offense against the United States in the Third Circuit, the government must prove that:

   1) two or more persons agreed to commit an offense against the United States, as charged in the indictment;

2) the defendant was a party to or member of that agreement;

3) the defendant joined the agreement or conspiracy knowing of its objectives to commit an offense against the United States and intending to join together with at least one other alleged conspirator to achieve those objectives; that is, that the defendant and at least one other alleged conspirator shared a unity of purpose and the intent to achieve a common goal or objective, to commit an offense against the United States; and

4) at some time during the existence of the agreement or conspiracy, at least one of its members performed an overt act in order to further the objectives of the agreement.

*See Third Circuit Criminal Jury Instruction.* §6.18.371A.

In the Third Circuit, conspirators need not have knowledge of all other members of a conspiracy, nor of all of their activities in support of the conspiracy. "The government need not prove that (name) knew everything about the conspiracy or that (he) (she) knew everyone involved in it, or that (he) (she) was a member from the beginning." 3d Cir. Model Criminal Jury Instructions 6.18.371D.

In *United States v. Boyd*, 595 F.2d 120 (3d Cir. 1978), the Third Circuit explained:

> The gist of a criminal conspiracy, the agreement between co-conspirators, may continue over an extended period of time and involve numerous transactions.  Parties may join the conspiracy after its inception, and may withdraw and terminate their relationship with the conspiracy prior to its completion.  The fact that conspirators individually or in groups perform different tasks in pursuing the common goal does not, by itself, necessitate a finding of several distinct

43

conspiracies.  And even if a small group of co-conspirators are at the heart of an unlawful agreement, others who knowingly participate with the core members and others to achieve a common goal may be members of a single conspiracy.

It follows from these basic principles that the government, without committing a variance between a single conspiracy charged in an indictment and its proof at trial, may establish the existence of a continuing core conspiracy which attracts different members at different times and which involves different sub-groups committing acts in furtherance of the overall plan.

595 F.2d at 123 (citations omitted); s*ee also United States v. Lee*, 359 F.3d 194, 207 (3d Cir. 2004), quoting *United States v. Kelly*, 892 F.2d 255, 258 (3d Cir. 1989), and *United States v. Smith*, 789 F.2d 196, 200 (3d Cir. 1986) ("[A] finding of a master conspiracy with subschemes does not constitute a finding of multiple, unrelated conspiracies."); *United States v. Salerno*, 485 F.2d 260, 262 (3d Cir. 1973) (defendants who provided counterfeit securities on only a few occasions to a core conspiracy which engaged in persistent securities fraud could be convicted of aiding and abetting the conspiracy); *United States v. Lester*, 282 F.2d 750, 753 (3d Cir. 1960) (single conspiracy to transport stolen property in interstate commerce "committed whether or not the parties comprehend its entire scope, whether they act separately or together, by the same or different means, known or unknown to some of them.").

Ultimately, the question of whether a single conspiracy or multiple conspiracy existed is a fact question to be decided by a jury. *Smith*, 789 F.2d at 200.  The only consideration in a Rule 12 motion to dismiss is whether the allegations in the Indictment, taken as true, sufficiently allege a single, timely indictment.  *See Huet*, 665 F.3d 588,

595-696.  The allegations contained within the Indictment establish such a single conspiracy, with multiple interdependent goals.

In cases that have gone to trial where there has been alleged a variance between the conspiracy charged in the Indictment and the evidence of conspiracy or conspiracies established at trial, the Third Circuit has identified three factors to determine if a single conspiracy existed, namely: "overlap of participants, identity of purpose, and identity of method." *United States v. Schurr*, 665 F.2d 549 (3d Cir. 1985) (*citing United States v. Maker*, 751 F.2d, 614, 625-626)(3d Cir. 1984).   While the application of these factors is premature to the present motion, all three factors still support a finding of a single charged conspiracy in this case.

Paragraphs 6 through 15 of Count 1 sufficiently allege a common purpose of the conspiracy, to "steal from the care, custody, and control of various museums certain objects of cultural heritage; knowing that certain objects of cultural heritage had been stolen…received, concealed, exhibited, or disposed of the objects, and transported in interstate of foreign commerce goods, wares, merchandise, securities or

45

money, of the value of $5,000 or more, knowing the same to have been stolen, converted, or taken by fraud…" (Doc. 1, ¶6).[6]

Count 1 goes on to describe the methods used by the conspirators to achieve their common goals.  In particular, the Indictment alleges that the defendants and the other conspirators used nearly identical methods to conduct each theft, transportation, and concealment/disposal of the stolen items, namely: identification of a target, research on that target, break-in and taking of the objects of cultural heritage, inspection and distribution of the stolen objects back in northeastern Pennsylvania, and the disposal or concealment of the stolen objects, either at property controlled by a conspirator or sold in New York City.

Finally, the Indictment alleges extensive overlap of participants in the single count of conspiracy.  Defendants Dombek and Boland are involved, in some way, with nearly every alleged theft.  Defendant Joseph Atsus is alleged to have actively participated in the thefts from

---

[6] These interdependent and related goals themselves constitute separate crimes. 18 U.S.C. §668(b)(1), §668(b)(2), and §2314.  *United States v. Knox*, 347 F.2d 33, 39 (3d Cir. 1965) (Conspiracy count may allege purpose to commit multiple substantive offenses).

Keystone College, the Everhart Museum, Space Farms Zoo & Museum, Ringwood Manor, Scranton Country Club, Sterling Hill Mining Museum, and the Yogi Berra Museum & Learning Center. Joseph Atsus is also alleged to still be actively concealing the items stolen from the Everhart Museum, Space Farms Zoo & Museum, and Ringwood Manor. Defendant Alfred Atsus, while not alleged to have been an active participant in as many thefts as the other defendants, is still alleged to be actively concealing the artwork and other objects of cultural heritage stolen from the Everhart Museum, Space Farms Zoo & Museum, and Ringwood Manor.

The defendants further argue that the periods of time between various museum thefts is evidence that Count 1 alleges several conspiracies, not one master conspiracy. They are mistaken. The detailed targeting, planning, and execution of each museum theft *required* delays between each theft. The Indictment alleges that the Defendants and other conspirators took "multiple visits" during the planning stages of each theft. (Doc. 1, ¶8, 15). The Indictment alleges that after conducting these multiple visits, the Defendants and other conspirators reviewed their recordings to analyze security measures

47

and to conduct further research into the objects on display therein. These overt acts do not occur overnight.

Finally, the Indictment alleges that one of the common goals of the conspiracy, namely the continued concealment of the stolen objects of cultural heritage, is a continuing crime. *See United States v. U.S. Gypsum Co.*, 600 F.2d 414, 417 (3d Cir. 1979) ("continuous conspiracy as one that 'contemplates bringing to pass a continuous result that will not continue without the continuous cooperation of the conspirators to keep it up.'") (*quoting United States v. Kissel*, 218 U.S. 601, 607 (1910)). Time gaps between thefts do not indicate the end of a conspiracy if one of the goals of that conspiracy is to continue to conceal the items stolen in previous thefts. Here, the defendants are alleged to have concealed stolen items on their property or hidden on the property of their family members. These continuing actions of concealment indicate that the charged conspiracy continued uninterrupted between each theft, and was one, continuous, criminal agreement.

### III.   *The Conspiracy Charged in the Indictment Occurred with the Statute of Limitations*

The defendants also argue that Count 1 should be dismissed because it alleges acts and conspiracies which fall outside of the statute of limitations for conspiracy.  As discussed above, the defendants mistakenly claim that Count 1 of the Indictment improperly joins several unrelated conspiracies and not a single conspiracy.  Because the Indictment properly alleges a single conspiracy between August of 1999 and continuing through September of 2019, this argument must also be dismissed.

The statute of limitations for conspiracy under 18 U.S.C. §371 is five years. 18 U.S.C. §3282; *United States v. Gordon*, 335 Fed. Appx. 236, 238-239 (3d Cir. 2009) (nonprecedential).[7]  That five-year period runs not from the first overt act taken during the existence of the conspiracy, but from the last. *Fiswick v. United States*, 329 U.S. 211, 216 (1946); *see also United States v. Jake*, 281 F.3d 123, 129 (3d Cir. 2002).

---

[7] Uniquely, two of the substantive offenses the defendants conspired to commit have twenty-year statute of limitations.  18 U.S.C. §3294.

The Indictment was filed on June 6, 2023.  Therefore, to be timely, Count 1 of the Indictment must allege that at least one overt act occurred after June 6, 2018.  *See Jake*, 281 F.3d at 129.  Here, the Indictment alleges twenty-two overt acts (No. 125, 138-158) which occurred after that date. (Doc. 1).  Additionally, the Indictment alleges five overt acts that began prior to that date but describe continuing acts that continued after that date, namely the continued concealment of stolen property from Keystone College, Everhart Museum, and Space Farms Zoo & Museum (Doc. 1, ¶15, Nos. 6, 13, 21, 22, 23).

Additionally, one of the objects of the conspiracy, the continued concealment of the stolen objects of cultural heritage, is a continuing crime.  *See Gypsum Co.* 600 F.2d at 417.  Such crimes continue long after the all the elements necessary for their prosecution fall into place and extend the five-year statute of limitations until the crime is complete. A conspiracy to conceal is analogous to certain conspiracies to obstruct justice, in that the purpose of the conspiracy to continue to keep another act hidden. *See United States v. Maloney*, 71 F.3d 645, 659-660 (7th Cir. 1995) (conspiracy to obstruct justice is a continuing crime).

50

Concealment of stolen objects is a continuing crime because that offense requires the continuing actions of the concealing party, such as, for example: maintaining control over the access to the hiding spot, moving the object around to various hiding locations, or maintaining expensive equipment to safeguard the property such as safes and/or security monitors. Furthermore, the language of 18 U.S.C. §668(b)(2), contemplates that the act of concealment is continuous. ("knowing an object of cultural heritage had been stolen...receives, *conceals*, exhibits, or disposes of the object.").[8] Therefore, the statute of limitations would not begin to run until that concealment is complete, i.e. the object is discovered or destroyed. As the Indictment alleges that the defendants have continued to conceal the stolen objects of cultural heritage well past June 6 of 2018, Count 1 of the Indictment is timely.

These acts of concealment, alleged to be part of the original conspiracy, differ from acts of concealment taken merely to hide the existence of an already completed plot. As the defendants rightly point

---

[8] The inclusion of "conceal" as one way to commit this crime, along with receiving the stolen objects, exhibiting them, or disposing of them, implies a continuous act. Concealment infers continuously keeping something secret, as opposed to disposing of or exhibiting an object, which suggest final or temporally limited acts.

out, concealment of a criminal plot after its completion is a natural component of all conspiracies and cannot be used to extend the stature of limitations. *United States v. Grunewald*, 353 U.S. 391, 406 (1957). However, this does not apply when one of the original objectives of the conspiracy is the concealment itself. *See United States v. Maloney*, 71 F.3d at 69-660; *United States v. Mann*, 161 F.3d 840, 859 (5th Cir. 2004).

## <u>CONCLUSION</u>

For the above-described reasons, the Defendants' motion lacks merit and should be denied. Count 1 of the Indictment sufficiently alleges the Defendants were part of a single conspiracy, and the Indictment was filed within the appropriate statute of limitations for that Count.

Respectfully submitted,

GERARD M. KARAM
United States Attorney

Date: Septembe12, 2024          /s/ James M. Buchanan
JAMES M. BUCHANAN
Assistant U.S. Attorney
Attorney ID #PA30012
235 N. Washington Ave., Ste. 311
Scranton, PA 18503

52

Tel. No. (570) 348-2800
james.buchanan@usdoj.gov

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | CR. NO. 3:23-CR-149 |
| v. | : | |
| | : | |
| NICHOLAS DOMBEK, | : | |
| DAMIEN BOLAND, | : | (Judge Mannion) |
| ALFRED ATSUS and | : | |
| JOSEPH ATSUS, | : | |
| | : | |
| Defendants. | : | (electronically filed) |
| | : | |

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that she is an employee in the Office of the United States Attorney for the Middle District of Pennsylvania and is a person of such age and discretion as to be competent to serve papers.

That on September 12, 2024, she served a copy of the attached:

## GOVERNMENT'S BRIEF IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS COUNT 1 OF THE INDICTMENT FOR FAILURE TO STATE AN OFFENSE

by ECF filing upon:

Patrick A. Casey, Esq.
Attorney for Defendant Joseph Atsus

Jason J. Mattioli, Esq.
Attorney for Defendant Alfred Atsus

Matthew L. Clemente, Esq.
Attorney for Defendant Damien Boland

54

Bernard Brown, Esq.
Attorney for Defendant Nicholas Dombek


/s/ Christina M. Nihen
CHRISTINA M. NIHEN
Legal Administrative Specialist