**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA,** | : | **CR. NO. 3:23-CR-149** |
| **v.** | : | **(JUDGE MANNION)** |
| **DAMIEN BOLAND.** | : | |
| | : | |
| **Defendant.** | | |

## MEMORANDUM

This matter comes before the Court on Defendant Damien Boland's motions to compel the production of any and all audio and/or video recordings of the United States Of America's (the "Government") anticipated trial witness, Thomas J. Trotta, Jr. ("Trotta"), and that of his attorney acting as his agent, in the possession of Non-Parties CBS News, Incorporated ("CBS"), author Jon Wertheim, The Atlantic Monthly Group, LLC ("TAMG") and author Ariel Sabar (Docs. 156 and 169), and the aforementioned Non-Parties' motions to quash such production (Docs. 176 and 200). The Court heard oral arguments on December 18, 2024. For the reasons set forth below, Defendant's motion to compel as to CBS and Jon Wertheim (Doc. 156) will be **GRANTED in part** subject to the condition that Defendant Boland's request complies with Rule 17(c) of Federal Rules of Criminal Procedure which will be determined at trial, and CBS's corresponding motion

to quash (Doc. 176) will be **DENIED**; and Defendant's motion to compel as to TAMG and Ariel Sabar (Doc. 169) will be **DENIED** and TAMG's corresponding motion to quash (Doc. 200) will be **GRANTED.**

## I.    <u>Background</u>

### A. The Indictment and Allegations Against Defendants

On June 6, 2023, a federal grand jury sitting in Scranton, Pennsylvania returned an indictment charging Defendants Damien Boland, Nicholas Dombek, Alfred Atsus and Joseph Atsus with one count of Conspiracy to Commit Theft of Major Artwork, Concealment and Disposal of Major Artwork, and Interstate Transportation of Stolen Property, in violation of 18 U.S.C. §371. Nicholas Dombek was further charged with eight counts of Concealment or Disposal of Major Artwork, in violation of 18 U.S.C. §668 and §2, one count of Theft of Major Artwork, in violation of 18 U.S.C. §668 and §2, and one count of Interstate Transportation of Stolen Property, in violation of 18 U.S.C. §2314 and §2. Damien Boland was further charged with eight counts of Concealment or Disposal of Major Artwork, in violation of 18 U.S.C. §668 and §2, and two counts of Theft of Major Artwork, in violation of 18 U.S.C. §668 and §2. Joseph Atsus was further charged with four counts of Concealment or Disposal of Major Artwork, in violation of 18 U.S.C. §668 and §2, and one count of Theft of Major Artwork, in violation of

18 U.S.C. §668 and §2. Alfred Atsus was further charged with three counts of Concealment or Disposal of Major Artwork, in violation of 18 U.S.C. §668 and §2, and one count of Theft of Major Artwork, in violation of 18 U.S.C. §668 and §2. (Doc. 1).

In Count 1 of the indictment the government specifically alleges that from August 1999 to June 2019 Defendants conspired with Thomas Trotta, Dawn Trotta, Frank Tassiello, Ralph Parry, and Daryl Rinker to steal objects of cultural heritage from museums around the country. During the nearly twenty years the conspiracy allegedly existed the government claims that Defendants and other conspirators conducted research to locate collections containing valuable pieces of artwork, antiques, sports memorabilia, and other items. Defendants and other conspirators would travel to these collections and conduct "reconnaissance" to determine if it was worth stealing a given object. Once a theft was agreed upon and planned, members of the conspiracy, including the moving Defendant, allegedly would meet at pre-arranged locations, travel to the museum or other target of the burglary, break in, smash or destroy the protective display cases, and steal and remove the objects on display. After the stolen objects were taken, members of the conspiracy, including the Defendant, would transport them

back to Northeastern Pennsylvania, where they would itemize, distribute, and break-down the stolen objects between the members of the conspiracy.

Three locations in particular were allegedly utilized for these activities: the residence of Dombek, the residence of conspirator Dawn Trotta, and a bar owned and operated by Boland. At his residence Dombek allegedly stripped stolen items, including Yogi Berra's World Series Rings, of their gemstones and other valuable attachments before melting them down into easily transportable pieces of valuable metal. Dombek also allegedly burned or buried several paintings brought to his home. When he was arrested on related state charges Dombek went to the homes of Boland and conspirators Dawn Trotta and Darlyn Rinker, where he threatened them. He further is alleged to have attempted to buy a fatal amount of fentanyl to kill a government witness and had in his possession a poison plant allegedly with the intent to use it for the same purpose. For this Dombek was also charged with witness intimidation.

When the indictment in this case was filed moving Defendants were all timely arraigned and released. However, Dombek fled into the woods of Northeastern Pennsylvania and remained at large until he surrendered on January 1, 2024. After a year of delays, in part caused by Dombek's flight, a joint trial of Dombek and the other Defendants is scheduled to begin on

January 13, 2025. All other conspirators except Darlyn Ricker, who passed away on April 18, 2024, have pled guilty and are now awaiting sentence.

### B. Trotta Crimes and Involvement

On May 22, 2023, an Information was filed with this Court charging Trotta with theft of major artwork in violation of 18 U.S.C. §668. *United States of America v. Thomas Trotta*, Civ. No. 3:23-cr-00127-MEM (M.D. Pa. Jun. 15, 2023) (Doc. 1). That same day, Trotta entered into a plea agreement and agreed to cooperate with the Government in its prosecution of Trotta's alleged co-conspirators. *Id.* at (Doc. 5). On June 15, 2023, Trotta appeared before Judge Saporito for his initial appearance and was later released subject to certain conditions. *Id.* at (Doc. 16). Those conditions included not violating any federal, state, or local laws while on release and reporting all arrests, traffic stops, or other police contact to his pretrial services officer. *Id.* On July 5, 2023, Trotta appeared before this Court and pled guilty. *Id.* at (Doc. 20). Trotta remained released pending sentencing.

While on pretrial release and while cooperating with the Government, Trotta allegedly continued to commit crimes. For example, on August 30, 2023, shortly after entering his guilty plea, Trotta allegedly entered LaNard Jewelry wearing a flat cap and a surgical mask to hide his identity, and stole a necklace and bracelet valued at $1,500. (Doc. 170, p. 5). On the night of

January 27, 2024, into January 28, 2024, Trotta allegedly committed another theft in Dunmore, Pennsylvania and was later charged with two felonies by the Dunmore Police Department. (*Id.* at p. 7). Trotta is allegedly the "mastermind" of the wide-ranging conspiracy that the Defendants are charged with and the connecting tissue between all the co-conspirators. Furthermore, Defendant Boland asserts that "[n]one of Trotta's co-defendants' DNA was recovered[,] … [t]here is no surveillance video depicting [co-defendants] at the locations of the burglaries when they occurred[,] there is no cell site location information indicating that [co-defendants] were at the locations of the burglaries when they occurred" and "[a]bsent any physical or forensic evidence placing them at the burglaries at the time of the burglaries, the Government relies almost entirely on Trotta to implicate [co-defendants] in [their] offenses." (Doc. 170, p. 14).

### C. Interviews with Jon Wertheim

On April 27, 2024, CBS broadcast a report on *60 Minutes* (a news program run by CBS) about Trotta, his career as an art and memorabilia thief, and this case.[1] That report included footage of interviews with Trotta

---

[1] Jon Wertheim, *Meet Tommy Trotta: the thief who stole Yogi Berra, Roger Maris and Carmen Basilio memorabilia*, 60 Minutes (Apr. 7, 2024), https://cbsnews.com/news/tommy-trotta-the-thief-who-stole-yogi-berra-roger-maris-carmen-basilio-memorabilia-60-minutes-transcript/  (containing
*(footnote continued on next page)*

conducted by CBS News reporter Jon Wertheim. During the interview, Trotta is described as "the theft ring's mastermind," and Trotta stated that he would bring unwitting individuals, including his niece and nephew, with him to scout museums to burglarize. According to Wertheim, Trotta stated that he "grew up a thief" and "still believed in Santa when he began stealing." Wertheim additionally notes that Trotta stated that "theft became his full-time job."

Several months later, on July 30, 2024, *Sports Illustrated* published an article by Wertheim, which relied on his earlier interviews with Trotta and included quotes from Trotta's lawyer, Joseph D'Andrea. (Doc. 176, p. 1-2).[2] In the article, Wertheim describes a conversation with Trotta where he acknowledged being "the biggest sports memorabilia thief in history." This article notes that, after stealing Hall of Fame pitcher Christy Mathewson's jersey, Trotta spent several years with his co-conspirators "rampaging locally, often reselling the stolen merchandise online." As shown, Trotta spoke about his, and his co-conspirators', conduct during the earlier

---

transcript of broadcast "Wertheim 60 Minutes") (video of interview available at https://youtube.com/watch?v=k7-Sw_atPmg.)

  [2] Jon Wertheim, *Crime Ring: The Story of the Sports World's Most Infamous Thief*, Sports Illustrated (July 30, 2024), https://www.si.com/mlb/digital-cover-crime-ring-sports-memorabilia-thief-tommy-trotta#:~:text==Tommy%20Trotta%20Jr.,as%audacious%20as%20the%20thefts.

interviews which were not broadcasted on the *60 Minutes* program. For example, the article explored Trotta's attempted burglary of the Hillwood Museum while the edited interview on 60 Minutes centered on the theft of Yogi Berra's World Series rings. According to the *Sports Illustrated* article, Trotta told that organization as well as *60 Minutes* "his whole story." (Doc. 156, p. 10).

### D. Interviews with Ariel Sabar

In addition to his interviews for *60 Minutes* and *Sports Illustrated*, Trotta was interviewed by Arial Sabar, a journalist whose work has appeared in publications including *The Atlantic Magazine* and *The New York Times*. (Doc. 169, Exhibit A). According to Defendant Boland, Sabar recorded the interview with Trotta in public at Cara Mia's Delicatessen ("Cara Mia's") in Dunmore, Pennsylvania. However, the only evidence presented by Defendant of such a recorded conversation is footage of Sabar holding a cellphone while speaking with Trotta. Definitively, Trotta's person at Cara Mia was identified by the owner of Cara Mia, Cara Mia Iannieli Lowe (Doc. 169, Exhibit B), Fred Larnerd, who is the owner of LaNard Jewelry (Doc. 169, Exhibit C), and an unidentified customer at Cara Mia's. However, no evidence was presented to support the contention that a customer allegedly overheard Trotta speaking about crimes he committed while on pretrial

release or any other crime, which did not appear in any of the provided sworn declarations.

Non-party TAMG asserted that Sabar "is currently working on a story about some of the events and individuals involved in this criminal case." (Doc. 200, Ex. 5, p. 1). However, that reporting has not yet been published in any form.

### E. Procedural History

On September 25, 2024, two subpoenas were issued upon *60 Minutes* and Wertheim for video and audio recordings of Trotta and his counsel (Doc. 156, Exhibit A). Counsel for Paramount Global ("Paramount"), the parent company of CBS, agreed to accept service of both subpoenas on September 27, 2024, as the interviews used for the *Sports Illustrated* article were derived from the *60 Minutes* program. Counsel for Defendant Boland and Paramount agreed to construe the scope of the subpoena upon *60 Minutes* to reach "any and all audio and/or video recordings of conversations, interviews, or statements with or made by Thomas J. Trotta" or his attorney (Doc. 156, Exhibit B). On October 9, 2024, Paramount counsel, on behalf of CBS, sent a letter to Defense counsel objecting to the subpoena as "improperly seek[ing] pre-trial production of non-party, non-evidentiary material under Rule 17(c)" and, even if production was allowed, the material sought was

"protected by the reporter's privilege under the First Amendment to the U.S. Constitution and Federal Rule of Evidence 501." (Doc. 156, Exhibit C).

On October 9, 2024, Defendant Boland filed a Motion to Compel (Doc. 156). On November 7, 2024, CBS filed a Motion to Quash the subpoena served by Defendant Boland to Paramount on two separate grounds. (Doc. 176). On December 3, 2024, the Government wrote a letter indicating that it does not take a position regarding the Motion to Compel. (Doc. 195). The parties have since filed briefs.

On September 27, 2024, a subpoena was issued upon Sabar for any and all audio and/or video recordings of Trotta and/or his counsel (Doc. 169, Exhibit D).  On October 1, 2024, Defendant Boland's counsel spoke with the General Counsel for TAMG, the publishing company for *The Atlantic Magazine*. He accepted service for the subpoena as of October 2, 2024. TAMG counsel indicated that Sabar interviewed Trotta on assignment for *The Atlantic Magazine* and that it would not produce a journalist's documents absent a court order. On October 10, 2024, TAMG counsel objected to the subpoena. (Doc. 169, Exhibit E). On October 29, 2024, Defendant Boland filed a Motion to Compel. (Doc. 169). On December 6, 2024, Non-Parties Ariel Sabar and TAMG filed a Motion to Quash Defendant Boland's subpoenas. (Doc. 200). The parties have since filed briefs. All parties

regarding this matter were heard during oral arguments on December 18, 2024.

## II.    Discussion

### A. The Reporter's Qualified Privilege

In rare cases, a conflict arises between the First Amendment and the criminal defense process. This tension has been described as a balance between the "freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct." *Branzburg v. Hayes*, 408 U.S. 665, 710 (1972). This is such a case.

On the one hand, CBS and TAMG argue that the subpoenas seeking the production of "any and all audio and/or video recordings of conversations, interviews, or statements with or made by Thomas J. Trotta" and his attorney should be quashed because the First Amendment bestows upon them a privilege to refuse to make such a production. Defendant Boland counters that the qualified privilege in this case must yield to his constitutional rights to a fair trial under the Fifth Amendment and to compulsory process and effective confrontation and cross-examination of adverse witnesses under the Sixth Amendment. "Courts must tread carefully on the hallowed ground where these basic concerns, the free flow of information and the fair

administration of criminal justice, conflict." *United States v. Criden*, 633 F.2d 346, 358 (3d Cir. 1980).

After a trilogy of cases, the Third Circuit has established a qualified federal common law privilege – the reporter's privilege – for journalists to refuse to disclose their confidential sources, a reporter's resource materials and other unpublished information, even when those materials involve known sources. *See Riley v. City of Chester*, 612 F.2d 708 (3d Cir. 1979), *United States v. Cuthbertson*, 630 F.2d 139 (3d Cir. 1980) ("*Cuthbertson I*") and *Criden*, 633 F.2d at 346. Beginning with *Riley*, set in the context of a civil case, the *Riley* court set forth a three-prong inquiry whereby the assertion of the privilege and the litigant's need for evidence would be balanced on an *ad hoc*, case-by-case basis. 612 F.2d at 716. The *Riley* court held that the materiality, relevance, and necessity of the information sought must be shown. *Id.* In so holding, the court emphasized that the circumstances in which the issue arose must first be considered. *Id.*

The Third Circuit extended the reporter's qualified privilege to criminal cases in *Cuthbertson I*, 630 F.2d at 148. The *Cuthbertson I* court expanded the *Riley* holding to protect unpublished materials held by reporters, as is the case here. *See Cuthbertson I*, 630 F.2d at 147. To wit:

"We do not think that the privilege can be limited solely to protection of sources. The compelled production of a reporter's resource materials can constitute a significant intrusion into the newsgathering and editorial processes. Like the compelled disclosure of confidential sources, it may substantially undercut the public policy favoring the free flow of information to the public that is the foundation for the privilege. Therefore, we hold that the privilege extends to unpublished materials in the possession of CBS."

*Id.* (internal citations omitted). In applying the three-pronged *Riley* test, the *Cuthbertson I* court concluded that film and audio tapes or written transcripts of verbatim or substantially verbatim statements made by interviewees who were on the government's witness list were "unique bits of evidence that are frozen at a particular place and time," and found that the government's need for the evidence outweighed the privilege. *Id.* at 148. Furthermore, assessing the various factors a court considers when balancing the privilege against the need for evidence, the *Cuthbertson I* court noted that "the lack of a confidential source may be an important element in balancing the defendant's need for the material sought against the interest of the journalist in preventing production." *Id.* at 147.

In *Criden*, the Third Circuit held that a journalist, summoned as a defense witness in a criminal proceeding, could not refuse to affirm or deny

that she had a conversation with a particular individual who had already publicly testified that the conversation occurred. 633 F.2d at 359. In so holding, the Court surmised that the party seeking disclosure of information "probably should be required to prove less to obtain the reporter's version of a conversation already voluntarily disclosed by the self-confessed source than to obtain the identity of the source itself." *Criden*, 633 F.2d at 358; *see also Gonzales v. Nat'l Broad. Co., Inc.*, 186 F.3d 102, 109 (2d Cir.1999) (holding that when protection of confidentiality is not at stake the qualified privilege should be more easily overcome).

None of the parties contest whether a reporter's privilege exists or that it is a qualified privilege subject to a balancing test. However, the parties disagree as to its application to their respective positions.

### B. Application of the *Riley* Criteria

In applying the three *Riley* factors to this case, this Court has to strike "a proper balance between freedom of the press and the obligation of all citizens to give relevant testimony with respect to criminal conduct." *Criden*, 633 F.2d at 357 (quoting *Branzburg*, 408 U.S. at 710). Moreover, the Court must be mindful of the following instructive observations. First, as the *Riley* Court admonished, this Court must "consider first the circumstances in which the issue arose." *Riley*, 612 F.2d at 716.

Like *Cuthbertson I*, this case implicates non-published information. But unlike *Cuthbertson I*, this case deals with a self-avowed source whose identity is publicly known and is expected to be a critical witness in the criminal case. It is also understood that this is not a case where the Defendant is seeking the reporters' personal notes or files. Rather, Defendant Boland seeks the limited information of "any and all audio and/or video recordings of conversations, interviews, or statements with or made by Thomas J. Trotta," an anticipated trial witness crucial for the prosecution, and his attorney acting as his agent.

The Court must recognize that the scope of the qualified privilege is circumscribed by the purposes it serves. Logic and fairness demand that "[t]he rule follows where its reason leads; where the reason stops, there stops the rule." *Criden*, 633 F.2d at 356 (citing *United States v. Schreiber*, 599 F.2d 534, 537 (3d Cir. 1979)). Furthermore, the moving party is required to prove less to obtain the information where, as here, a version of the conversation was already voluntarily disclosed by the self-confessed source. *See id.* at 358; *Cuthbertson I*, 630 F.2d at 147.

With the foregoing in mind, the Court next must apply the three *Riley* factors. The *Riley* court suggested a "delicate balancing" of the interests at

hand, in which the materiality, relevance, and necessity of the information sought must be demonstrated. *See Riley*, 612 F.2d at 717.

First, the moving party must demonstrate that it has made an effort to obtain the information from other sources. *See Criden*, 633 F.2d at 358–59. In terms of the materials in possession of CBS, another source quite obviously is the broadcasted *60 Minutes* interview segment and the published article on *Sports Illustrated.* The published article contains a written version of conversations and interviews had between Wertheim and Trotta with certain quotes. The printed article is not the equivalent of the audio tape and must be distinguished from the audio tape containing the interview from which the quotes in the article are derived from. To properly assess the credibility of Trotta as a witness, it would be best for the jury to hear the actual conversation between Wertheim and Trotta, and not just read mere snippets of the interview printed in the article. A live conversation permits the listener to judge certain credibility aspects of the speakers. Similarly with the *60 Minutes* interview segment, Wertheim summarizes some of the taped conversations with Trotta. For example, Wertheim states "[t]heft became … [a] full-time job" for Trotta, but this statement is a summary and narration from Wertheim, not Trotta's own words. Again, to assess Trotta's credibility as a witness, the jury must be able to hear the actual

conversation between Wertheim and Trotta—including conversations that did not make the final cut of the *60 Minutes* segment. In contrast, with regards to Trotta's interviews and conversations with Sabar, no other source is available because *The Atlantic Magazine* article has not been published. Thus, Defendant Boland has satisfied the first criterion.

Second, the moving party must show that the only access to the information sought is through the reporter and the source. *See Criden*, 633 F.2d at 359. The facts of this case are somewhat different than *Criden* in that the moving party is seeking unpublished recordings of interviews and conversations, and not the journalists' testimonies or identification of a confidential source. Nevertheless, this analysis is the same as that for the first criterion. What is sought by Defendant Boland is not only "what" was said and left out from the article and the *60 Minutes* segment, but also "how" it was said. Here, much like in *Criden*, only by listening to the complete unpublished video recordings and other recorded conversations will the jury be able to evaluate Trotta's credibility. This particular quality of the conversation can only be experienced by listening to the audio tape itself or watching the unpublished videos. Much like *Cuthbertson I*, the audio tape represents "unique bits of evidence that are frozen at a particular place and time." *Cuthbertson I*, 630 F.2d at 148. Therefore, the Defendant has no other

source from which he can acquire this insight. The second criterion is equally met.

Relevance and importance to the particular proceeding is the final criterion under R*iley*. *See Criden*, 633 F.2d at 359. *Criden* intimated that the party seeking the privileged information must demonstrate that the information is "crucial" to the claim. However, the United State District Court for the District of New Jersey reviewing Third Circuit precedent on reporter's privilege understood such burden to be lowered where the information sought is nonconfidential and the source is self-avowed. *In re Grand Jury Empaneled*, 99 F.Supp.2d 496, 501 (D.N.J. May 24, 2000) citing *Cuthbertson I*, 630 F.2d at 147. This Court agrees. Accordingly, the Defendant should only have to establish that the information sought is necessary for impeachment purposes.[3]

The Defendant has satisfied the final criterion as to CBS. The purpose of challenging Trotta's testimony is to sift through the evidence he will provide and determine whether Defendant Boland was implicated. Trotta's interview with Wertheim went directly to the conduct and crimes charged in this case.

---

[3] If the heightened burden applied, this Court would nevertheless—as would any other court presented with the factual allegations in this case—be hard pressed not to find that Trotta's anticipated testimony at trial is crucial to the Government's prosecution as would be any impeachment materials to the defense.

Clearly the motivation and credibility of Trotta as the "mastermind" of the theft ring are pertinent to the jury's deliberations. Only by listening to the taped conversation, watching the full unpublished videos, or reading a complete transcript of Trotta's interviews will the jury be able to appraise the credibility of Trotta's "story" as to the broader theft ring and conspirators involved. In light of the jury's purpose to weigh the credibility it attributes to Trotta's testimony, then, the contents of any audio tapes, transcripts or unpublished video recordings are germane to the determination of whether crimes were committed. Such recordings may be necessary to the jury's fact determination of the events that transpired as described by Trotta in the *60 Minutes* segment and the *Sports Illustrated* article. The Court notes, however, that though the materials are deemed relevant and important, the defense is already in possession of substantial impeachment materials and that any further materials proffered or retained by CBS or TAMG would not likely change the outcome of this case. More may just be redundant and cumulative. Nevertheless, this Court cannot conclude that more would be unnecessary at this stage of the proceedings. Accordingly, the Defendant has met all the *Riley* factors and, therefore, CBS's reporter's privilege to guard against producing those portions of Trotta's interview contained in any

recorded conversations and unpublished video recordings is superseded by the countervailing interests in this particular case.

As to TAMG and Sabar, however, Defendant Boland has not satisfied the final criterion under *Riley*. The Court is unable to determine what conversations were had between Sabar and Trotta, and to what extent the contents of their conversations relate to the matter at hand. According to the submitted materials, part of Sabar and Trotta's allegedly overheard conversation at Cara Mia related to Trotta's crimes while he was on pretrial release. But such crimes are not relevant to the crimes Defendant Boland is charged with. Even if, tangentially, such material may be used for impeachment purposes, other sources such as police reports and filed indictments may be available to the defense. Allowing Defendant Boland to dig for any relevant information in Trotta and Sabar's conversations, without knowing the full extent of the topics they explored, is tantamount to permitting a fishing expedition. *See United States v. Nat'l Talent Assocs., Inc.*, 1997 WL 829176, at *3 (D.N.J. Sept. 4, 1997) (quashing subpoena for outtakes from interview, noting that the subpoenaing party, "of course, has no knowledge of the contents of the privileged portions of the tapes, thus is forced to make a … conjecture regarding their relevance"). Furthermore, unlike the matter with CBS where the balance of interests slightly favored the

Defendant's Fifth and Sixth Amendment rights, the matter with TAMG and Sabar favor the protection of TAMG and Sabar's First Amendment rights. The "compelled production of a reporter's resource materials can constitute a significant intrusion into the newsgathering and editorial processes," *Cuthbertson I*, 630 F.2d at 147, and such an intrusion is of even greater consequence when the reporter has not even completed such process. The editorial process is safeguarded as much as the confidential nature of sources because the "free flow of information" is equally protected when reporters and editors have the freedom to exercise their discretion in selecting which information to disseminate to the public and how best to present such information. Accordingly, TAMG's motion to quash will be granted.

### C. Waiver of Reporter's Privilege

Defendant Boland asserts that TAMG and Sabar have "waived" the reporter's privilege because Sabar purportedly interviewed Trotta at Cara Mia, and Trotta was "overheard telling Mr. Sabar about … crimes [Trotta committed] while released pending sentencing." (Doc. 170, pp. 21, 27). This argument fails both as a matter of fact and law.

First, the basis upon which Defendant Boland grounds his assertion is an unidentified "customer" overheard "Trotta discussing the residential

burglary that he committed in Dunmore earlier in the year." (Doc. 170, p. 9). Defendant Boland provided sworn testimony from Cara Mia's owner, private investigator James Quiroz, and Fred Larnerd, the owner of LaNard Jewelry, to support the identification of Trotta and Sabar at Cara Mia ordering food, but has provided no testimony from this anonymous "customer." Furthermore, even if true, the conversation overheard related to crimes committed by Trotta that do not relate to Defendant Boland and his alleged co-conspirators charged in this matter. Sabar has explained that, in the course of his reporting, he interviewed Trotta in a private location. (Doc. 200, Ex. 4, Decl. of Sabar, ¶29). They went together to Cara Mia to order takeout lunch, but spent only a few minutes in the restaurant; stayed only long enough to order, pay and receive the food; and were mindful to "keep [their] distance from—and face away from—any nearby customers, most of whom quickly came and went with their orders." (*Id.*, ¶31). Sabar "was not aware of any customers who were close enough to [them] for long enough to hear anything meaningful from the talk Trotta and [Sabar] had during [their] few minutes at the restaurant." (*Id.*).

Second, Defendant Boland appears to confuse the reporter's privilege with attorney-client privilege, for which "confidentiality is essential to protected communications." *Super Tire Eng'g Co. v. Bandag Inc.*, 562 F.

Supp. 439, 441 (E.D. Pa. 1983) (quoting *Barr Marine Products Co. v. Borg-Warner Corp.*, 84 F.R.D. 631, 634-35 (E.D. Pa. 1979)). TAMG notes that Defendant Boland failed to provide any authority for the far-reaching proposition that any journalist who conducts an interview in a public place is thereby waiving the reporter's privilege for their unpublished newsgathering materials. The Court agrees. Furthermore, even if the inadvertent disclosure of a portion of Sabar's conversation with Trotta had any effect on the application of the reporter's privilege, that effect would be strictly limited to the precise portions of the conversation that a third-party overheard. Publication of privileged information constitutes a waiver only as to that specific information. However, since no such information was published, there is no waiver, and this argument is dismissed.

### D. Federal Rule of Criminal Procedure 17(c)

Given that the qualified reporter's privilege for CBS is superseded by the countervailing interests in this particular case, the remaining question is whether production of CBS's unpublished information should occur before trial or after Trotta testifies. CBS argues that Rule 17 of the Federal Rule of Criminal Procedure limits the production of the unpublished material until after Trotta testified. The Court agrees.

Rule 17(c) provides the following:

(c) Producing Documents and Objects.

> (1) In General. A subpoena may order the witness to produce any books, papers, documents, data, or other objects the subpoena designates. The court may direct the witness to produce the designated items in court before trial or before they are to be offered in evidence. When the items arrive, the court may permit the parties and their attorneys to inspect all or part of them.
>
> (2) Quashing or Modifying the Subpoena. On motion made promptly, the court may quash or modify the subpoena if compliance would be unreasonable or oppressive.

Fed. R. Crim. P. 17(c). The Third Circuit has explained that "Rule 17(c) was not intended to be a broad discovery device, and only materials that are 'admissible as evidence' are subject to subpoena under the rule." *United States v. Cuthbertson*, 651 F.2d 189, 192 (3d Cir. 1981) ("*Cuthbertson II*") (quoting *Bowman Dairy v. United States*, 341 U.S. 213, 221 (1951)). "The Supreme Court has determined that a rule 17(c) subpoena reaches only evidentiary materials." *Id.* at 195. "The [Supreme] Court extended the admissibility requirement of rule 17(c) to materials held by third parties in *United States v. Nixon*[.]" *Id.* citing (*Nixon*, 418 U.S. 683, 699-700 n. 12 (1974)). In *Nixon*, the Supreme Court explained that "in order to require production prior to trial, the moving party must show: (1) that the documents are evidentiary and relevant; (2) that they are not otherwise procurable

reasonably in advance of trial by exercise of due diligence; (3) that the party cannot properly prepare for trial without such production and inspection in advance of trial and that the failure to obtain such inspection may tend unreasonably to delay the trial; and (4) that the application is made in good faith and is not intended as a general 'fishing expedition.'" 418 U.S. at 699-700. "[I]n order to carry his burden, [the moving party] must clear three hurdles: (1) relevancy; (2) admissibility; (3) specificity." *Id.* at 700. Though Defendant Boland has shown that the information sought is relevant and specific, he has not "explained how the CBS materials could be admissible as evidence, unless [Trotta] testified and made inconsistent statements." *Cuthbertson II*, 651 F.2d at 195.

The Third Circuit has reviewed these particular timing and admissibility questions in *Cuthbertson II*, which guides this Court in how to manage production of the CBS materials—if such production occurs. Specifically, the Third Circuit found that "only materials that are 'admissible as evidence' are subject to subpoena" under rule 17. *Id.*, 651 F.2d at 192. Defendant Boland has not demonstrated "any potential use of the present materials as evidence in the trial other than for purposes of impeachment." *Id.* at 195. Similarly to *Cuthbertson II*, the materials sought by Defendant Boland, "[o]n their face, … are simply hearsay." *Id.* Defendant Boland has not asserted "a relevant

exception to the hearsay rule." *Id.* citing Fed. R. Ev. 802. The Third Circuit noted that "[o]nly after a witness has testified will his prior inconsistent statements cease to be hearsay, *see* Fed. R. Ev. 801(c), but we are unable to speculate on the likelihood of that occurrence." *Id.* Thus, Trotta's prior statements to Wertheim, if inconsistent to his anticipated testimony at trial, "ripen into evidentiary material for purposes of impeachment only if and when [Trotta] testifies at trial[.]" *Cuthbertson I*, 630 F.2d at 144. Accordingly, as a matter of law, the materials sought by Defendant Boland from CBS may not be obtained at this time by a rule 17(c) subpoena. *Cuthbertson II*, 651 F.2d at 195.

However, Defendant Boland has made a sufficient showing to justify production of CBS's materials to the Court for *in camera* review if his subpoena complies with rule 17(c) only if and when Trotta testifies at trial and makes impeachable statements.[4] Pretrial production for *in camera* review in this case is necessary to aid this Court in "its preparation for ruling on whether these statements will be produced to the defendants at trial [in] an attempt to avoid unnecessary delay and disruption of the trial." *Cuthbertson I*, 630 F.2d at 145. Accordingly, CBS will be ordered to produce

---

[4] The Court will also have to review whether such statements are merely cumulative to the materials already in possession of Defendant Boland or substantively distinctive to warrant production.

- 26 -

the requested materials for *in camera* review and its motion to quash will be denied.

### III.    Conclusion

Based on the foregoing, Defendant's motion to compel as to CBS and Jon Wertheim (Doc. 156) will be **GRANTED in part** subject to the condition that Defendant Boland's request complies with Rule 17(c) of Federal Rules of Criminal Procedure which will be determined at trial, and CBS's corresponding motion to quash (Doc. 176) is **DENIED**. CBS is directed to produce the requested materials to this Court for *in camera* review. Furthermore, Defendant's motion to compel as to TAMG and Ariel Sabar (Doc. 169) is **DENIED** and TAMG's corresponding motion to quash (Doc. 200) is **GRANTED**.

*s/ Malachy E. Mannion*
**MALACHY E. MANNION**
**United States District Judge**

**DATE: January 6, 2025**
23-149-05

- 27 -